275 N.J. Super. 182 (1994)
645 A.2d 1218
CHRISTINE BALIKO, CLAUDIA CASE AND KELLY CARROLL, PLAINTIFFS-RESPONDENTS,
v.
JOSEPH P. STECKER, INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 825, A, B, C, D, & RH: AFL-CIO AND STEPHEN FROSTICK, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued March 15, 1994.
Decided July 20, 1994.
*184 Before Judges PRESSLER, BROCHIN and KLEINER.
Wayne J. Positan argued the cause for appellants Joseph P. Stecker and Stephen Frostick (Lum, Hoens, Conant, Danzis & Kleinberg, attorneys; Mr. Positan, of counsel; Domenick Carmagnola and Dana D. Farinella, on the brief).
William J. Riina argued the cause for appellant International Union of Operating Engineers, Local 825 (Wilson, Elser, Moskowitz, *185 Edelman & Dicker, attorneys; Mr. Riina, of counsel; John F. Tratnyek, on the brief).
Linda A. Palazzolo argued the cause for respondents (Connell, Foley & Geiser, attorneys; Ms. Palazzolo, of counsel; Timothy E. Corriston and Marjorie O. Smith, on the brief).
The opinion of the court was delivered by BROCHIN, J.A.D.
Defendants Joseph P. Stecker and Stephen R. Frostick are members of defendant Local 825, a union local affiliated with the International Union of Operating Engineers. The local had a contract dispute with George Harms Excavating Company, a corporation which is affiliated with George Harms Construction Company. The latter corporation was a general contractor for construction of a portion of Route 24. In order to influence George Harms Excavating Company, the local picketed a construction site which George Harms Construction Company maintained near Route 24 in Morristown, New Jersey. Plaintiffs Christine Baliko, Claudia Case, and Kelly Carroll are construction workers employed by George Harms Construction Company at its Morristown construction site. They have filed this suit to recover damages from defendants as compensation for defendants' conduct on the picket line.
Plaintiffs' complaint alleges claims for intentional infliction of emotional distress, intentional interference with contractual relations and with prospective economic advantage, and sexual harassment in violation of the New Jersey Law Against Discrimination (referred to as "LAD"), N.J.S.A. 10:5-1 to -42. Defendants moved for summary judgment dismissing the complaint. The motion judge dismissed all of plaintiffs' claims except those based on the defendants' alleged violations of the LAD. Defendants moved for leave to appeal from the motion judge's refusal to dismiss plaintiffs' claims for sexual harassment. Plaintiffs cross-moved for leave to appeal from the dismissal of all but their sexual harassment claims. We granted defendants' motion and we denied *186 plaintiffs'.[1] The sole issue before us on this appeal is therefore whether the motion judge was correct in declining to hold that, as a matter of law, defendants' picket line activities, as described by plaintiffs, did not violate the LAD.
Since we are reviewing the denial of defendants' motion for summary judgment, we must accept plaintiffs' descriptions of defendants' conduct as true and give plaintiffs the benefit of all inferences from the facts that can reasonably be drawn in their favor. R. 4:46-2; Judson v. Peoples Bank & Trust Co., 17 N.J. 67, 75, 110 A.2d 24 (1954); Antheunisse v. Tiffany & Co., Inc., 229 N.J. Super. 399, 402, 551 A.2d 1006 (App.Div. 1988), certif. denied, 115 N.J. 59, 556 A.2d 1206 (1989). Viewed from that perspective, the record depicts the following facts.
During the course of their work and at the beginning and end of each workday, plaintiffs had to pass defendants' picket line in order to go to and from the George Harms Construction Company construction site. As plaintiffs walked or drove past the picket line and through the gate at the construction site, pickets who were members of the defendant local, including defendants Stecker and Frostick, intentionally harassed the plaintiffs with sexually derogatory gestures and exclamations.
Plaintiff Baliko accuses defendant Stecker of harassing her as she passed by making "foul, vulgar and obscene gestures," including grabbing and pointing to his genitals and then putting his hand to his mouth as if inviting her to perform fellatio. She claims that she observed Stecker conducting himself in this way for the first time on July 5, 1990, and that he repeated this conduct toward her on July 27, August 2, 8, 9, 10, 14, 22, and 29, September 6, 1990, and July 16, and September 11, 1991. Baliko also alleges that, on one occasion, the vice-president of Local 825 called her a "stupid son-of-a-bitch" and that on another occasion *187 an unidentified picket grabbed his genitals while she was going out of the gate.
Plaintiff Case also claims that defendant Stecker and other members of Local 825 abused and harassed her as she entered and exited the front gate of the Route 24 construction site. Some time shortly after June 29, 1990, a union member yelled at her, "I bet she has no muff, and if she does, it's very small." Then or on another occasion, a picket called her an "ugly bitch." On July 31, 1990, Stecker yelled to her, "Are you going to give them a blow job?," and asked the male co-employees she was with, "How is she? She can't be very good because her nose is too big  it must get in the way!" On August 7, 1990, Stecker shouted, "That's the ugliest woman I've ever seen." Later that day, another member of Local 825 exclaimed in Case's presence, "That stupid cunt isn't saying anything. She has no balls like the rest of them." On September 5, 1990, a member of Local 825 yelled out to Case while she was riding in the back of a work van, "That's where she belongs, in the back of the truck." Later that day, while she was riding in the van to a different part of the job, another member of the local made hand gestures which were intended to refer to fellatio. On June 4, 1991, the vice-president of the local told Case, "Here's Miss America. She's so gorgeous, you have to hold back all the guys." On June 6, 1991, another member of the local said to Case, "Is Willie your boyfriend? Black man, white car, white wife. The All-American dream." On June 7, 1991, the local's vice-president said to Case, "Here comes my woman. How would you like your million, in cash or check?" On June 10, 1991, he exclaimed in her presence, "Here comes my beauty queen. She's so gorgeous everyone wants to sexually harass her. Watch out or she may sue you." That same day, a person whom Case did not identify, but who was presumably a picket, told her she "looked like a guy." On June 11, 1991, Stecker exclaimed on seeing Case, "What a beautiful woman!" On June 18, 1991, the local's vice-president called out to Case, "What a beautiful girl," and someone else, presumably a picket, said to her, "You are ugly!"
*188 Plaintiff Kelly Carroll accuses defendant Stephen Frostick of abusing and harassing her on January 14, 1991. As she was driving out of the construction site, Frostick yelled something at her that she did not hear because her car windows were closed. Then he twice pointed to his genitals. Several days later, as she walked through the gate, one of the pickets yelled, "What an ugly broad! I'd never go out with an ugly chick like that. Boy, are you ugly!"
Plaintiffs contend that these facts, construed most strongly in their favor since we are reviewing the denial of defendants' motion for summary judgment, show a violation of N.J.S.A. 10:5-12, which, insofar as pertinent, states:
It shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination:
....
b. For a labor organization, because of the ... sex of any individual ... to discriminate in any way ... against any employer or any individual employed by an employer....
....
e. For any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this act, or to attempt to do so.
Plaintiffs contend that the local has violated paragraph "b" and the individual defendants, paragraph "e."
Lehmann v. Toys `R' Us, Inc., 132 N.J. 587, 601-02, 626 A.2d 445 (1993), establishes sexual harassment as a form of sex discrimination that violates N.J.S.A. 10:5-12. The opinion describes two categories of sexual harassment:
Quid pro quo sexual harassment occurs when an employer attempts to make an employee's submission to sexual demands a condition of his or her employment. It involves an implicit or explicit threat that if the employee does not accede to the sexual demands, he or she will lose his or her job, receive unfavorable performance reviews, be passed over for promotions, or suffer other adverse employment consequences. Hostile work environment sexual harassment, by contrast, occurs when an employer or fellow employees harass an employee because of his or her sex to the point at which the working environment becomes hostile.
....
[T]he harassing conduct need not be sexual in nature; rather, its defining characteristic is that the harassment occurs because of the victim's sex. See Muench v. *189 Township of Haddon, 255 N.J. Super. 288 [605 A.2d 242] (App.Div. 1992) (holding defendant employer liable for hostile work environment sexual harassment where employees harassed dispatcher because she was female although harassment was not sexual in nature).
[Lehmann, supra, 132 N.J. at 601-02, 626 A.2d 445.]
Plaintiffs in the present suit accuse defendants of hostile work environment sexual harassment. Lehmann, supra, 132 N.J. at 603-04, 626 A.2d 445, summarizes the elements of a female worker's claim for hostile work environment sexual harassment as follows:
[A] female plaintiff must allege conduct that occurred because of her sex and that a reasonable woman would consider sufficiently severe or pervasive to alter the conditions of employment and create an intimidating, hostile, or offensive working environment. For the purposes of establishing and examining a cause of action, the test can be broken down into four prongs: the complained-of conduct (1) would not have occurred but for the employee's gender; and it was (2) severe or pervasive enough to make a (3) reasonable woman believe that (4) the conditions of employment are altered and the working environment is hostile or abusive.

Lehmann then goes on to elaborate on each of these elements. First of all, there is no violation of the Law Against Discrimination if the same conduct would have occurred regardless of the plaintiff's sex. Id. at 604, 626 A.2d 445. If in the present case, for example, the pickets were "equally crude and vulgar to all employees, regardless of their sex, no basis exists for a sex harassment claim." Ibid. Secondly, the allegedly harassing conduct must be "severe or pervasive." Id. at 606, 626 A.2d 445. This standard encompasses conduct of varying degrees of severity and pervasiveness. Lehmann tells us that in an extreme case, a single incident may be sufficiently severe to make the working environment illegally hostile. Id. at 606-07, 626 A.2d 445. In other cases, the requisite degree of hostility will have been created by "numerous incidents that, if considered individually, would be insufficiently severe to state a claim." Id. at 607, 626 A.2d 445. Thirdly, although the amount of compensatory damages that can be recovered will depend on the proof of injury, the requirements of a cause of action are satisfied by proof of an "injury ... no more tangible or serious than that the conditions of employment have been altered and the work environment has become abusive." *190 Id. at 610, 626 A.2d 445. A plaintiff "establishes the requisite harm if she shows that her working conditions were affected by the harassment to the point at which a reasonable woman would consider the working environment hostile." Ibid. Furthermore,
In making that showing, the plaintiff may use evidence that other women in the workplace were sexually harassed. The plaintiff's work environment is affected not only by conduct directed at herself but also by the treatment of others. A woman's perception that her work environment is hostile to women will obviously be reinforced if she witnesses the harassment of other female workers. Therefore, .. . the plaintiff need not personally have been the target of each or any instance of offensive or harassing conduct. Evidence of sexual harassment directed at other women is relevant to both the character of the work environment and its effects on the complainant.
[Id. at 611, 626 A.2d 445.]
Lastly, "[i]n evaluating whether the harassment alleged was sufficiently severe or pervasive to alter the conditions of employment and to create a hostile or intimidating work environment for a female plaintiff, the finder of fact shall consider the question from the perspective of a reasonable woman." Id. at 611-12, 626 A.2d 445.
Lehmann is concerned with "[h]ostile work environment ... occur[ring] when an employer or fellow employees harass an employee because of his or her sex to the point at which the working environment becomes hostile." Plaintiffs argue that Lehmann's analysis is also applicable to Local 825, Stecker, and Frostick, although they are not an "employer or fellow employees" of plaintiff, because the quoted provisions of N.J.S.A. 10:5-12b and -12e impose liability on a "labor organization" and its aiders and abettors for sexual harassment that causes a hostile working environment. For the following reasons, we agree.
Labor unions focus their efforts on the workplace. It is the principal arena for their activities. For example, in the present case, a trier of fact could find that Local 825 was trying to make the conditions of employment at the Morristown construction site uncomfortable in order to affect the outcome of its dispute with George Harms Excavating Company. Eliminating discrimination in employment, including the elimination of workplace *191 environments hostile to disadvantaged groups, is a primary goal of the LAD. By referring explicitly to labor organizations in N.J.S.A. 10:5-12b, the Legislature has recognized that a labor union has the potential to critically influence whether a workplace environment will be hostile or welcoming to women and minorities whom the LAD seeks to protect against employment discrimination. We conclude therefore that the conduct which plaintiffs have alleged, if attributable to Local 825, would violate N.J.S.A. 10:5-12b. Furthermore, we conclude that if plaintiffs' allegations are proved at trial, they would permit a trier of fact to find that that conduct was authorized, sanctioned, or ratified by the local, either expressly or implicitly, and that Local 825 has therefore violated the LAD as interpreted by Lehmann.
N.J.S.A. 10:5-12e, which makes it an unlawful discrimination "[f]or any person, whether an employer or an employee or not, to aid [or] abet ... any of the acts forbidden under" LAD, does not define "aid" or "abet." Generally, the combination, "to aid or abet," is used in criminal law. In that context, we have defined "aid" as meaning "to assist, support or supplement the efforts of another," and "abet" as meaning "to encourage, counsel, incite or instigate the commission of a crime." State v. Newell, 152 N.J. Super. 460, 469, 378 A.2d 47 (App.Div. 1977). The terms have frequently been used with the same meaning in civil law contexts. See, e.g., Jaclyn, Inc. v. Edison Bros. Stores, Inc., 170 N.J. Super. 334, 368, 406 A.2d 474 (Law Div. 1979); Schneider v. Hamilton Trust Co., 116 N.J. Eq. 55, 57, 172 A. 517 (Ch. 1934), aff'd, 119 N.J. Eq. 93, 181 A. 42 (E. & A. 1935). "Aid" and "abet" are used in the same sense in N.J.S.A. 10:5-12e. A "labor organization" referred to in N.J.S.A. 10:5-12b can act only through its agents. If one member assists, supports, encourages, and supplements the efforts of another in conduct which violates the LAD, the local may be liable as a principal for violating N.J.S.A. 10:5-12b and individual members may be liable as aiders and abettors for violating N.J.S.A. 10:5-12e.
*192 Nationally, the leading case on sexual harassment as a form of sex discrimination is probably Meritor Sav. Bank v. Vinson, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). In that case, the Supreme Court, quoting Henson v. Dundee, 682 F.2d 897, 902 (11th Cir.1982), said,
Sexual harassment which creates a hostile or offensive environment for members of one sex is every bit the arbitrary barrier to sexual equality at the workplace that racial harassment is to racial equality. Surely, a requirement that a man or woman run a gauntlet of sexual abuse in return for the privilege of being allowed to work and make a living can be as demeaning and disconcerting as the harshest of racial epithets.
[Meritor Savings Bank v. Vinson, supra, 477 U.S. at 67, 106 S.Ct. at 2405, 91 L.Ed.2d at 59 (emphasis added).]
The dictionary defines the term, "gauntlet," as "a double file of men facing each other and armed with clubs or other weapons with which to strike at an individual who is made to run between them." Webster's Ninth New Collegiate Dictionary 508 (1988). The "gauntlet" to which Meritor refers is largely metaphorical. In the present case, the picket line which the plaintiffs had to cross was, according to their testimony, much more literally a "gauntlet of sexual abuse." If Local 825 and the individual defendants were responsible for establishing and maintaining it, they have violated the prohibitions of LAD as interpreted by Lehmann. The motion court was therefore correct in declining to enter summary judgment dismissing plaintiffs' claims against defendants based on N.J.S.A. 10:5-12b and -12e.
To prevail at trial, plaintiffs will, of course, have to prove the facts which constitute the alleged violation of N.J.S.A. 10:5-12b and -12e. In addition, the parties will have to deal with a difficult legal issue which is not fully discussed in their briefs. Because the acts of harassment which the plaintiffs allege were solely verbal, this case requires the resolution of an apparent conflict between the LAD as interpreted by Lehmann and the free speech guaranty of the First Amendment. See Eugene Volokh, Note, Freedom of Speech and Workplace Harassment, 39 UCLA L.Rev. 1791 (1992); Kingsley R. Browne, Title VII as Censorship: Hostile Environment Harassment and the First Amendment, 52 Ohio *193 St.L.J. 481 (1991); cf. Iota XI Chapter of Sigma Chi Fraternity v. George Mason University, 993 F.2d 386 (4th Cir.1993) (university sanctions against fraternity for conducting "Ugly Woman" contest violated First Amendment).
Our Supreme Court considered a similar problem in State v. Vawter, 136 N.J. 56, 642 A.2d 349 (1994). Following the United States Supreme Court's decision in R.A.V. v. City of St. Paul, 505 U.S. ___, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992), Vawter holds that the First Amendment invalidates a statute which makes it a crime to "put another in fear of bodily violence by placing on public or private property a symbol, an object, a characterization, an appellation or graffiti that exposes another to threats of violence, contempt or hatred on the basis of race, color, creed or religion, including, but not limited to[,] a burning cross or Nazi swastika." Vawter, supra, 136 N.J. at 62, 642 A.2d 349 (quoting N.J.S.A. 2C:33-10). In analyzing R.A.V. in order to apply its reasoning to the New Jersey statute, Vawter quotes as part of R.A.V.'s rationale that the St. Paul ordinance was unconstitutional because "it has proscribed fighting words of whatever manner that communicate messages of racial, gender or religious intolerance." Vawter, supra, 136 N.J. at 73, 642 A.2d 349 (quoting R.A.V., 505 U.S. at ___, 112 S.Ct. at 2549, 120 L.Ed.2d 324). The holding of the New Jersey Supreme Court is, "Inasmuch as the language of the [challenged sections of the statute] limits their scope to the disfavored topics of race, color, creed, and religion, the statutes offend the First Amendment." Vawter, supra, 136 N.J. at 77, 642 A.2d 349.
In the light of R.A.V. and Vawter, the question must be addressed whether the LAD can constitutionally be interpreted as punishing speech which is bigoted and sexually, racially, or religiously offensive, if that speech is unaccompanied by illegal, nonverbal conduct. We have not attempted to deal with the problem both because it should be considered in the light of a full factual record and because it was not fully briefed or argued by the parties. But cf. Madsen v. Women's Health Center, Inc., ___ U.S. *194 ___, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994) (sustaining place and manner restrictions on peaceful picketing); Horizon Health Center v. Felicissimo, 135 N.J. 126, 638 A.2d 1260 (1994) (same); Murray v. Lawson, 136 N.J. 32, 642 A.2d 338 (1994) (same).
The order appealed from is affirmed and the case is remanded to the trial court for further proceedings not inconsistent with this opinion.
NOTES
[1] Defendant Local 825 moved separately from defendants Stecker and Frostick for leave to appeal. When the motions were granted, they were given separate docket numbers. We now consolidate both appeals.