730 A.2d 895 (1999)
Christine BALIKO, Claudia Case and Kelly Carroll, Plaintiffs-Appellants/ Cross-Respondents,
v.
INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 825, A, B, C, D, & RH: AFL-CIO, Defendant-Respondent/ Cross-Appellant, and
Joseph P. Stecker and Stephen Frostick, Defendants.
Superior Court of New Jersey, Appellate Division.
Argued March 23, 1999.
Decided June 22, 1999.
*897 Theodore W. Geiser, Roseland, for plaintiffs-appellants /cross-respondents (Connell, Foley & Geiser, attorneys; Mr. Geiser, of counsel; John F. Neary and Steve Livingston, on the brief).
*898 William J. Riina, Newark, for defendant-respondent/cross-appellant (Wilson, Elser, Moskowitz, Edelman & Dicker, attorneys; Mr. Riina, of counsel; Mr. Riina and John B. Monahan, on the brief).
Before Judges PRESSLER, KLEINER, and STEINBERG.
*896 The opinion of the court was delivered by KLEINER, J.A.D.
This is the third appeal relating to a claim for damages asserted by three female construction workers against the defendants, a labor union local and two of its members, for sexual discrimination in violation of N.J.S.A. 10:5-12, a provision of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 to -42 ("LAD"). In Baliko v. Stecker, 275 N.J.Super. 182, 645 A.2d 1218 (App.Div.1994) ("Baliko I"), we concluded that plaintiffs' second amended complaint asserting individual claims for sexual harassment in violation of the LAD could not be summarily dismissed on defendant's motion for summary judgment. Thus, we affirmed an interlocutory order of the Law Division denying defendant's motion for summary judgment. We remanded to the Law Division for a jury trial. Id. at 194, 645 A.2d 1218.
In Baliko I, we noted:
Defendants Joseph P. Stecker and Stephen R. Frostick are members of defendant Local 825, a union local affiliated with the International Union of Operating Engineers. The local had a contract dispute with George Harms Excavating Company, a corporation which is affiliated with George Harms Construction Company. The latter corporation was a general contractor for construction of a portion of Route 24. In order to influence George Harms Excavating Company, the local picketed a construction site which George Harms Construction Company maintained near Route 24 in Morristown, New Jersey. Plaintiffs Christine Baliko, Claudia Case [now Claudia Case-Clayton], and Kelley Carroll are construction workers employed by George Harms Construction Company at its Morristown construction site. They have filed this suit to recover damages from defendants as compensation for defendants' conduct on the picket line.
[Id. at 185, 645 A.2d 1218.]
We particularly noted:
To prevail at trial, plaintiffs will, of course, have to prove the facts which constitute the alleged violation of N.J.S.A. 10:5-12b and -12e. In addition, the parties will have to deal with a difficult legal issue which is not fully discussed in their briefs. Because the acts of harassment which the plaintiffs allege were solely verbal, this case requires the resolution of an apparent conflict between the LAD as interpreted by Lehmann [v. Toys `R' Us, Inc., 132 N.J. 587, 626 A.2d 445 (1993) ] and the free speech guaranty of the First Amendment.
[Id. at 192, 645 A.2d 1218 (citations omitted).]
After further discussion, we also stated: We have not attempted to deal with the problem [of the apparent conflict between the LAD and the free speech guaranty of the First Amendment] both because it should be considered in the light of a full factual record and because it was not fully briefed or argued by the parties.[1]
[Id. at 193, 645 A.2d 1218.] *899 In reaching our decision, we were constrained to accept plaintiffs' descriptions of defendants' conduct as true and give plaintiffs the benefit of all inferences from the facts that could reasonably be drawn in their favor pursuant to R. 4:46-2. Id. at 186, 645 A.2d 1218. We fully reviewed all of the underlying facts asserted by plaintiffs either in their second amended complaint or by certification in defense of defendants' motion for summary judgment. Id. 186-88, 645 A.2d 1218. We incorporate those facts in this opinion.
Following Baliko II, see supra note 1, and prior to the trial, the judge bifurcated plaintiffs' claims for punitive damages; thus, the trial focused solely on questions of liability and compensatory damages. The testimony at trial confirmed the facts previously asserted in the myriad of pleadings, including certifications prior to Baliko I, and as referenced in our published opinion. Id. at 186-88, 645 A.2d 1218. In plaintiffs' direct case, each plaintiff also testified to additional events involving defendants occurring after the filing of the initial complaint and particularly after the plaintiffs filed their second amended complaint which added plaintiff Carroll.[2]
Baliko, who was employed as an iron worker, carpenter, and "operator," drove a company van to the Route 24 site each day, transporting five to eight male co-workers from their homes. Shortly after the project began, Baliko began to keep notes of incidents that occurred upon arriving and leaving the Harms construction site.
Baliko testified that "every time [she] pulled in the gate," defendant Joseph P. Stecker, a union member, would be "standing there giving [her] gestures pertaining to oral sex." Her notes recorded about a dozen incidents occurring in July, August, and September 1990, and in July and September 1991. She related that before her complaint was filed on September 12, 1990, Stecker would taunt her. "He would put his hands behind his back and lean back and straddle his legs wide." She also indicated on June 27, 1990, another picketer grabbed his crotch as she was leaving work. Although Baliko testified that the experiences were "degrading" and "humiliating" and made her feel "scared," she indicated that she never sought medical or psychological treatment; never missed a day of work; and never lost income as a result of the picketing incidents. She testified that, with one exception when her job location was moved after Stecker spoke to her,[3] she had received no different work assignments and her co-employees and supervisors treated her no differently.
Case-Clayton, employed as a surveyor, iron worker, and "operator," drove her own pickup truck to and from work each day. She also kept a diary of events. She indicated she had trouble getting "out of the gate because [the picketers] blocked the gate." She testified that there were:
about 10 to 15 picketers there. And there was a man out my driver side window [a] few feet away. And he said to me, "You're an ugly bitch. You have no muff or a very small one." And I *900 had to sit there say a period of one to three minutes before I could get out. Somebody in the background yelled, "Scab whore." That was it.
Case-Clayton also testified that on July 31, she was leaving work in a car pool with two men when Stecker said, "Are you going to give them a blow job? How is she? She can't be very good. Her nose is too big. It must get in the way"; on August 7, Stecker said, "That's the ugliest woman I've ever seen"; and another union member said, "The stupid cunt isn't saying anything. She had no balls like the rest of them"; and on September 11, 1990, Stecker imitated the hand signals Case-Clayton used while working as a surveyor and yelled the word "dike" at her.
Case-Clayton found these episodes "demeaning" and "embarrassing." She indicated that although she had some "physical effects" from these incidents, she missed no work, sought no medical advice, and suffered no monetary loss as a result of her experiences. She was never treated differently by her supervisors regarding work assignments nor was she denied a promotion.
In Baliko I, we summarized Carroll's complaint accusing Frostick of abuse and harassment on January 14, 1991, when he yelled at her and twice pointed to his genitals. Id. at 188, 645 A.2d 1218. We also noted that Carroll alleged that several days following the incident with Frostick, one picketer yelled, "What an ugly broad! I'd never go out with an ugly chick like that. Boy, are you ugly!" At trial, Carroll testified about those events. She also testified that in the summer of 1991, Scarpone got onto the running board of a truck she was operating, stuck his finger in her face, telling her, "You better stop making up lies about my people or you are going to be sorry." She also described another incident where a picketer yelled, "Your cunt smells like dead fish." Additionally, a videotape was played for the jury showing Frostick turning toward Carroll's truck and pointing towards his genitals. Carroll's testimony included a general description of the atmosphere surrounding the gate to the Harms worksite and the incidents in which she was involved which caused her to be terrified and upset. Like Baliko and Case-Clayton, Carroll did not seek medical attention, did not lose time from work, and had no problems with her co-workers.
We have elected to omit further references to the trial testimony. Suffice it to say, defendants were accused of numerous additional instances where explicit sexual language and gestures were used by picketers. We note, however, that after the second amended complaint was filed, Baliko also testified that she received several telephone calls to her home during which the caller threatened Baliko and suggested she and her co-plaintiffs dismiss the pending civil action.
At the close of plaintiffs' case, all defendants moved for judgment asserting plaintiffs had failed to establish that the conduct of any defendant was severe or pervasive. Additionally, both individual defendants argued that their actions were protected under the First Amendment. The trial judge granted defendant Frostick's motion on the basis that his conduct was neither severe or pervasive. The court reserved decision on the free speech issue until the close of all the evidence. Prior to summations, the court concluded that the First Amendment did not foreclose plaintiffs' action.
The jury found that none of the conduct of Local 825 constituted a violation of the LAD regarding plaintiffs Baliko or Carroll, and that none of Stecker's conduct constituted a violation of the LAD regarding all three plaintiffs. As to Case-Clayton, the jury found that Local 825's conduct towards her amounted to a LAD violation, but that the violation was not the proximate cause of any injury. Upon hearing the verdict, the court stated it would "mold the verdicts and enter judgments of no *901 cause of action on all of these counts of the complaint."
Thereafter, Case-Clayton by motion sought the following relief: correction of the molded verdict to reflect the finding that Local 825 had violated the LAD; a new trial on the issue of compensatory damages against Local 825; a trial to determine punitive damages against Local 825; and counsel fees, or alternatively, additur plus counsel fees.
In separate motions, Baliko and Carroll moved for a new trial on liability and damages only against Local 825, or alternatively, additur and counsel fees. Both women contend that once the jury found that a hostile work environment existed for Case-Clayton, it could not find differently as to either of them. The court denied each plaintiff's motion, and on Local 825's cross-motion, it entered judgment notwithstanding the verdict. By a separate post-verdict motion all defendants moved for counsel fees pursuant to N.J.S.A. 10:5-27.1. This motion was denied.
Plaintiffs have appealed the verdict as molded and the trial court's order denying a new trial as to Local 825 only.[4] Defendant Local 825 has filed a cross-appeal of the denial of its motion for attorney's fees and the trial court's rulings failing to dismiss plaintiffs' case under R. 4:37, or alternatively, its failure to conclude that it is entitled to First Amendment protection.[5] For reasons discussed hereafter, we reverse the jury verdict and remand for a new trial on all issues as to defendant Local 825.

I
We commence our analysis by first addressing defendant's cross-appeal.

A.
In Baliko I, we agreed with plaintiffs' contentions that the provisions in N.J.S.A. 10:5-12b prohibited discrimination by a union against "any employer or any individual employed by an employer" and thus we deemed defendant union potentially liable if its picketers created a hostile work environment by sexually harassing plaintiffs. 275 N.J.Super. at 188-90, 645 A.2d 1218. We also concluded that from the facts as alleged in plaintiffs' certifications, if so established at trial, a jury could find that the union "authorized, sanctioned, or ratified" the conduct of its picketers expressly or impliedly. Id. at 191, 645 A.2d 1218. We cautioned that, to establish their claim for discrimination based on sexual harassment, plaintiffs would be required to prove that "the complained-of conduct (1) would not have occurred but for the employee's gender; and it was (2) severe or pervasive enough to make a(3) reasonable woman believe that (4) the conditions of employment are altered and the working environment is hostile or abusive." Id. at 189, 645 A.2d 1218 (quoting Lehmann v. Toys `R' Us, Inc., 132 N.J. 587, 603-04, 626 A.2d 445 (1993)).
Defendant argues that plaintiffs did not establish a violation of LAD because the picketers' speech and gestures involved sexual connotations that were directed to and exchanged with Harms employees, irrespective of their gender. Defendant also argues the picketers' conduct was neither severe nor pervasive since plaintiffs testified to "only a handful of incidents" despite the fact that the "conduct complained of occurred over a period of 18 months" and plaintiffs "passed through the main gate on a daily basis." Defendant additionally asserts that the evidence failed to demonstrate that the conditions of plaintiffs' employment were altered because they lost *902 no days of work; failed to show that plaintiffs were demoted, did not receive promotions, or were treated differently by their supervisors; and failed to establish that plaintiffs' job performance was affected. Consequently, according to defendant, the court erroneously denied its motions for dismissal made at the end of plaintiffs' proofs under R. 4:37-2(b), renewed at the conclusion of all the proofs in accordance with R. 4:40-1, and presented again as a motion for judgment notwithstanding the verdict under R. 4:40-2, which was rendered moot by the trial court's denial of plaintiffs' post-trial motions.
In determining whether the trial court erroneously denied defendant's motions, the standard of review is the same whether considering a motion for dismissal made either at the close of plaintiffs' case or after all the evidence was presented. Dolson v. Anastasia, 55 N.J. 2, 5-7, 258 A.2d 706 (1969). This court must accept as true all evidence supporting plaintiffs' claims and accord them all legitimate inferences which could be reasonably deduced from that evidence. Id. at 5, 258 A.2d 706. Then we must determine whether the evidence thus construed could sustain a judgment in plaintiffs' favor. Ibid. If reasonable minds could have differed as to the outcome, the motion was properly denied. Ibid. Applying that standard to the facts in this case, defendant's arguments have no merit.
In Lehmann, supra, 132 N.J. 587, 626 A.2d 445, the Court held that in a hostile work environment case "the harassing conduct need not be sexual in nature; rather, its defining characteristic is that the harassment occurs because of the victim's sex." 132 N.J. at 602, 626 A.2d 445. It also stated:
Common sense dictates that there is no LAD violation if the same conduct would have occurred regardless of the plaintiff's sex. For example, if a supervisor is equally crude and vulgar to all employees, regardless of their sex, no basis exists for a sex harassment claim. Although the supervisor may not be a nice person, he is not abusing a plaintiff because of her sex.
[Id. at 604, 626 A.2d 445.]
However, the Court explained:

When the harassing conduct is sexual or sexist in nature, the but-for element will automatically be satisfied. Thus when a plaintiff alleges that she has been subjected to sexual touchings or comments, or where she has been subjected to harassing comments about the lesser abilities, capacities, or the "proper role" of members of her sex, she has established that the harassment occurred because of her sex.
[Id. at 605, 626 A.2d 445 (emphasis added).]
While it may be true that defendant's cross-examination of plaintiffs and their other witnesses demonstrated that certain comments from picketers may have been gender neutral, it is abundantly clear that other comments, some of which we have highlighted either in Baliko I or in this opinion, were not gender-neutral but, in fact, were gender-based as being inapplicable to men and only applicable to women. Unquestionably, the nature of the comments presented a jury question; thus, the trial judge correctly denied defendant's motions at the close of plaintiffs' case and at the close of the entire case.
It is clear from the testimony that male Harms employees did not perceive the references to oral sex directed toward them by picketers as either personally insulting or demeaning. It cannot be disputed that in our culture communication among men may regularly involve a kind of sexual bantering or a level of vulgarity generally absent from conversation among women. As the Court recognized in Lehmann, "the research and literature on sexual harassment suggest that there are differences in the way sexual conduct on the job is perceived by men and women" with men considering sexual comments as "`comparatively harmless amusement.'" *903 132 N.J. at 614, 626 A.2d 445 (quoting Kathryn Abrams, Gender Discrimination and the Transformation of Workplace Norms, 42 Vand. L.Rev. 1183, 1203 (1989)). In addition, remarks which may be sexually demeaning when made to a woman may not have the same effect when directed toward a man, and vice versa. For example, inferring that an individual had multiple or indiscriminately-chosen sex partners is more likely to be considered an insult when used toward a woman because it suggests that she has loose morals, but may be taken as a compliment to a man's virility. On the other hand, labeling a man a sexual "virgin" can be a humiliating suggestion that he is "less than someone's definition of masculine," Zalewski v. Overlook Hosp., 300 N.J.Super. 202, 211, 692 A.2d 131 (Law Div.1996), while traditionally that label has had no broad negative social connotations for women. Thus, the mere fact that the remarks and gestures regarding oral sex were directed to both men and women would not preclude a jury from finding that other remarks directed solely toward women constituted sexual harassment. Evidence existed from which a jury could find that plaintiffs were targeted for harassment because of their sex, and defendant's allegations that plaintiffs had failed to establish the but-for element thus requiring dismissal of their action has no merit.

B.
Defendant's argument that the conduct was neither severe nor pervasive also has no merit. In its closing argument to the jury it contended that defendant's conduct, at most, constituted "only a handful of incidents" spread over a period of eighteen months. Defendant raises that same argument on appeal. Defendant's argument totally ignores the significance of Taylor v. Metzger, 152 N.J. 490, 500-03, 706 A.2d 685 (1998) (determining that a single utterance of a racial epithet was sufficiently severe to produce a hostile work environment). Moreover, it ignores the distinction made in Lehmann that action need not be both severe and pervasive, as a dual requirement "would bar actions based on a single, extremely severe incident or, perhaps, even those based on multiple but randomly-occurring incidents of harassment." 132 N.J. at 606, 626 A.2d 445; see also Taylor, supra, 152 N.J. at 505-06, 706 A.2d 685.
In determining whether comments or gestures are severe or pervasive, the trial judge must instruct the jury to consider: (1) the total physical environment of the plaintiffs' work area; (2) the degree and type of obscenity that filled the environment of the workplace, both before and after the plaintiffs were assigned to the specific workplace; (3) the nature of the unwelcome sexual words or sexual gestures; (4) the frequency of the offensive encounters; (5) the severity of the offensive encounters; (6) whether the unwelcome comments or gestures were physically threatening; (7) whether the offensive encounters unreasonably interfered with any plaintiff's work performance, but subject to the admonition that each plaintiff is not obliged to prove that the unwelcome comments or gestures actually did interfere with each plaintiff's work performance; and (8) whether the offensive encounters had an effect on any plaintiff's psychological well-being, but also subject to an admonition that each plaintiff need not demonstrate specific psychological harm,[6] for, as we have noted, the nature *904 of the harm to any plaintiff is the creation of a hostile work environment.

C.
Defendant also contends that the trial judge should have granted its motion for dismissal because plaintiffs' proofs established that "no condition of their employment was altered in any way." In support of this argument, defendant relies upon testimony indicating that neither plaintiffs' employer nor their co-workers took any adverse action against them as a result of the harassment, and plaintiffs' reactions to the alleged harassment did not affect their ability to come to work or to perform their jobs.
Turning again to Taylor, supra, 152 N.J. 490, 706 A.2d 685, the Court concluded that "evidence of specific, tangible adverse changes in the work environment is not required in order to state a LAD racial harassment claim. `[A] loss of a tangible job benefit is not necessary since the harassment itself affects the terms or conditions of employment.'" Id. at 507, 706 A.2d 685 (quoting King v. Board of Regents of Univ. of Wisc. Sys., 898 F.2d 533, 537 (7th Cir.1990)). We do not read Taylor as limited to racial harassment; to the contrary, Taylor enhances our understanding of Lehmann that a plaintiff in a sexual harassment action need only prove that the conduct complained of would make a reasonable woman believe that the conditions of employment had been altered to the extent that the workplace environment had become hostile or abusive.
This conclusion is further buttressed by decisions of the United States Supreme Court construing a cause of action under Title VII of the Civil Rights Act of 1964 and concluding that a claimant need not prove the harassment culminated in "a tangible employment action, such as discharge, demotion or undesirable reassignment." Faragher v. Boca Raton, 524 U.S. 775, ___, 118 S.Ct. 2275, 2293, 141 L.Ed.2d 662, 666 (1998); see also Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, ___, 118 S.Ct. 2257, 2270, 141 L.Ed.2d 633, 655 (1998).
The record clearly demonstrates that plaintiffs' proofs indicated that with the advent of the picket line each plaintiff was regularly compelled to experience sexually-oriented taunting while entering and exiting the workplace. Each plaintiff testified, as did other co-workers, that at no other time had each been subjected to such treatment, a condition which changed with the arrival of the picketers. We thus conclude the trial judge properly denied each of defendant's motions. Defendant's cross appeal lacks merit.

II
The primary argument raised by plaintiffs' appeal is their contention that the trial judge erred in instructing the jury to apply the concept of "proximate cause" in determining whether an LAD violation occurred. We agree with plaintiffs and, accordingly, we reverse the judgment as entered and remand for a new trial on all issues.
In its charge, the trial court first instructed the jury that plaintiffs must prove by a preponderance of the evidence the four elements comprising an LAD violation as set forth by Lehmann, supra, 132 N.J. at 603-04, 626 A.2d 445. However, it later stated:
As I indicated to you, the plaintiffs must prove a violation of the Act by a preponderance or greater weight of the credible evidence. And, but they also must prove that the violation was a proximate cause of the injury. In other *905 words, was the violation the cause of the hostile environment or was it something else. By proximate cause [it] is meant that the negligence of the party being charged was an efficient cause of the injury, that is a cause which necessarily set the other causes in motion and was a substantial factor in bringing the injury about.
It is defined as a cause which naturally and probably led to and might have been expected to produce the injury complained of.
The judge's charge completely eviscerates the purpose of the LAD. As instructed by Lehmann:
Although the LAD provides for compensatory and punitive damages, it is not primarily a tort scheme; rather, its primary purpose is to end discrimination. Because discrimination itself is the harm that the LAD seeks to eradicate, additional harms need not be shown in order to state a claim under the LAD. In a claim of hostile work environment sexual harassment, the hostile work environment is the legally recognized harm. Therefore, a plaintiff in a hostile work environment sexual harassment case establishes the requisite harm if she shows that her working conditions were affected by the harassment to the point at which a reasonable woman would consider the working environment hostile.
[132 N.J. at 610, 626 A.2d 445.]
A proper jury instruction in a case of sexual harassment resulting in a hostile work environment must be tailored to reflect that a plaintiff must prove by a preponderance of the evidence that the workplace was permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive working environment. The jury must be instructed to utilize an objective standard and to evaluate evidence of severity or pervasiveness from the perspective of a reasonable woman's reaction.
In this trial, defendant presented evidence that in every picket line there are threats and profane gestures. We consider that evidence to be irrelevant in evaluating defendant's potential liability to these plaintiffs. Here the plaintiffs were not participating in union activity. Had that been the case, then evidence of standard picket line activity might be relevant in evaluating the severity or pervasiveness of activity utilizing the perspective of a reasonable woman. However, here, each plaintiff was lawfully entering and exiting her place of employment and was not in any manner involved with the union's dispute with her employer. The trial court must emphasize to the jury that it is unnecessary for each plaintiff to prove she was subjectively harmed to establish an LAD violation as the "hostile work environment is the legally recognized harm." Ibid.
The same error was incorporated within the jury questionnaire. The jury was asked to answer the following questions as to each plaintiff:
1. Did the conduct of the defendant, Local 825, constitute a violation of the Law Against Discrimination?
If the answer to Question No. 1 is "No" you need proceed no further as to plaintiff's claim against the Union.
If the answer to Question No. 2 is "Yes", proceed to Question No. 2.
2. Was the violation of LAD by Local 825 a proximate cause of any injury to plaintiff?
3. How much money will fairly and adequately compensate plaintiff?
As we have noted, utilizing a proximate cause factor in the jury instruction was error; so too was the inclusion of a proximate element in the jury questionnaire. Because the jury instructions were erroneous and the questions posed to the jury contained the same error, the entirety of *906 the verdict is tainted and requires a remand for a new trial.[7]
On remand, the assigned trial judge must, in explaining plaintiffs' burden of proof, follow Lehmann in its instruction that:
In making that showing [of a hostile work environment], the plaintiff may use evidence that other women in the workplace were sexually harassed. The plaintiff's work environment is affected not only by conduct directed at herself but also by the treatment of others. A woman's perception that her work environment is hostile to women will obviously be reinforced if she witnesses the harassment of other female workers. Therefore, we hold that the plaintiff need not personally have been the target of each or any instance of offensive or harassing conduct. Evidence of sexual harassment directed at other women is relevant to both the character of the work environment and its effects on the complainant.
[132 N.J. at 610-11, 626 A.2d 445.]
The trial judge in his charge must emphasize that each plaintiff need not have actually witnessed a form of sexual harassment directed at another woman in the workplace to perceive that she, as an individual, is being subjected to a hostile work environment. Here, plaintiffs requested the trial judge to so instruct the jury; however, plaintiffs' request was denied. We consider that ruling as contradictory to the standard established in Lehmann. Ibid.
Plaintiffs also contend on appeal that the trial judge incorrectly rejected their request that the jury be charged that if it found a hostile work environment as to one plaintiff, it must find a hostile work environment for all plaintiffs. We reject plaintiffs' contention. Although several plaintiffs were represented by the same trial counsel, each plaintiff's claim must be considered separately. Although a "plaintiff may use evidence that other women in the work place were sexually harassed," ibid., such evidence does not itself establish a successful cause of action for each plaintiff.
On remand, although plaintiffs have not appealed from the entry of judgment as to the individual defendants who were either a union representative or participants on the picket line, plaintiffs will be permitted to present evidence of all activities on the picket line in their effort to establish the liability of Local 825. Lehmann clearly instructs that an employer's liability for sexual harassment is governed by agency principles enunciated in Section 219 of the Restatement (Second) of Agency. 132 N.J. at 619, 626 A.2d 445. Because this case involves potential union liability for acts of picketers who may not be union employees, we conceive that the trial judge will be required to utilize other concepts of agency principles fully discussed in sections 215 to 218 of the Restatement and shall be guided by our observation in Baliko I, where we "conclude[d] that if plaintiffs' allegations are proved at trial, they would permit a trier of fact to find that that conduct was authorized, sanctioned, or ratified by the local, either expressly or implicitly, and that Local 825 has therefore violated the LAD as interpreted by Lehmann." 275 N.J.Super. at 191, 645 A.2d 1218. We also observed that a "labor organization" referred to in N.J.S.A. 10:5-12b can act only through its agents. If the members engaged in conduct that violated the LAD, the local may be liable as a principal for violating N.J.S.A. 10:5-12b. Ibid. Should the evidence at the new trial identify that any picketers were not actually union members, the court may still utilize the principles of agency law found in the Restatement to instruct the jury as to potential *907 union liability recognizing that participants on a picket line who may not be union members are still acting for and on behalf of the union in furthering the ultimate goal of the labor activity.

III
Although plaintiffs have not raised as a separate issue on appeal any contention that the trial judge erred in permitting defendants to argue that its picketers' conduct was protected speech under the First Amendment and, as such, the First Amendment was a defense for jury consideration, we conclude that any reference to the First Amendment particularly in defendant's opening or closing statements to the jury violates our prior instruction in both Baliko I, supra, 275 N.J.Super. at 192-94, 645 A.2d 1218, and in Baliko II, supra, slip op. at 6. We instructed in both prior opinions that the applicability of the First Amendment would be decided by this court after a factfinder concluded that the LAD had been violated. The trial judge on remand must adhere to our prior ruling and counsel must abide by that ruling in presenting the matter to the jury. However, should any plaintiff prevail at the new trial, defendant may raise its First Amendment claims on a post judgment motion. We thus modify our prior instruction in both Baliko I and Baliko II.

IV
Because we reverse and remand for a new trial on all issues, plaintiff Case-Clayton's argument that she, as a "prevailing party," is entitled to an award of counsel fees against defendant Local 825 pursuant to N.J.S.A. 10:5-27.1 is rendered moot.
Defendant's argument on its cross-appeal that the trial judge erred when he refused to award defendant counsel fees under the same statute is without merit, as an award of counsel fees to a defendant under N.J.S.A. 10:5-27.1 is predicated upon a finding that plaintiffs' action was in bad faith. It is abundantly clear that plaintiffs did not institute or pursue their claims in bad faith, nor can plaintiffs' claim be characterized as "frivolous, meritless and vexatious." Brisbane v. Port Auth. of N.Y. & N.J., 550 F.Supp. 222, 224 (S.D.N.Y.1982).
Reversed and remanded.
NOTES
[1] Despite our admonition that the apparent conflict between the LAD and the free speech guaranty of the First Amendment must be considered in light of a full record, Baliko I, supra, 275 N.J.Super. at 193, 645 A.2d 1218, defendants filed a motion for summary judgment seeking a dismissal of plaintiffs' second amended complaint. The motion judge concluded that defendants' behavior as described solely in plaintiffs' second amended complaint and in their respective certifications was protected under the First Amendment and he granted defendants' post-remand motion for summary judgment. On direct appeal from a final judgment in an unpublished per curiam opinion we reversed. Baliko v. Stecker, No. A-6708-94T5, 1996 WL 888178 (App.Div. July 30, 1996) ("Baliko II"). We again remanded the matter to the Law Division for a factual determination of whether defendants' conduct violated the LAD, declining to address the free speech issue "outside of a full factual context." Id. (slip op. at 7).
[2] Carroll was not a named plaintiff in the original complaint nor in the first amended complaint.
[3] On that occasion, Baliko indicated Stecker walked down a barrier to where she was "hanging on a form with a safety belt" and said, "[C]ome work for us and you can have all the guys that you want." Baliko's foreman instructed her to move her work location to a position where Stecker would be unable to see her.
[4] Plaintiffs do not appeal the dismissal of their complaint as to defendant Frostick nor do they appeal from the molded jury verdict in favor of defendant Stecker. We take no position on the correctness of the decisions as to the individual defendants.
[5] Plaintiffs' appeal does not encompass any claim asserted by any plaintiff as to defendants Stecker and Frostick. Neither Stecker or Frostick have participated in this appeal.
[6] See Harris v. Forklift Sys., Inc., 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), explaining:

[W]hether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required.
[Id., at 23, 114 S.Ct. at 371, 126 L.Ed.2d at 302-03.]
See also, Meritor Savings Bank v. Vinson, 477 U.S. 57, 65, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49, 59 (1986).
[7] Because there must be a new trial, we are not required to address plaintiffs' contentions that the verdict was against the weight of the evidence, or the alternative claims respecting compensatory and punitive damages.