847 A.2d 599 (2004)
368 N.J. Super. 540
RSB LABORATORY SERVICES, INC. a New Jersey Corporation, Plaintiff-Respondent/Cross-Appellant,
v.
BSI, CORP., d/b/a/ Block Scientific, Inc. and/or Block Scientific Equipment Exchange, Inc., a New Jersey Corporation, Defendant-Appellant/Cross-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued March 1, 2004.
Decided May 7, 2004.
*601 Andrew T. Fede, Hackensack, argued the cause for appellant/cross-respondent (Contant, Atkins & Fede, attorneys; Mr. Fede of counsel and on the brief; Christina A. Stoneburner, on the brief, North Plainfield).
Robert S. Dowd, Jr. and Peter James Herrigel, argued the cause for respondent/cross-appellant (Sternlieb & Dowd, attorneys, Hackensack; Mr. Herrigel, on the brief).
Before Judges PETRELLA, WEFING and FUENTES.
*600 The opinion of the court was delivered by FUENTES, J.A.D.
This is a breach of contract action instituted by plaintiff RSB Laboratory Services, Inc., against defendant BSI, Corporation (d/b/a Block Scientific, Inc., or Block Scientific Equipment Exchange, Inc.). A jury awarded plaintiff $254,763.55 in damages, including lost profits, attorneys' fees, costs and prejudgment interest.
Defendant appeals arguing that the Law Division erred when it denied its motion to: (1) dismiss plaintiff's claims for lost profits as barred under the new business rule; (2) dismiss plaintiff's consumer fraud claim and breach of warranty claims; and (3) exclude plaintiff's expert's testimony as a net opinion. Plaintiff cross-appeals arguing that the court erred when it denied its consumer fraud claim for treble damages.
Addressing the issues raised by the parties requires us to reexamine the continued legal viability of the so-called new business rule. Before doing so, we will lay out the facts of the case as revealed by the evidence presented at trial.

I
Ruth B. Yao graduated from college with a degree in medical technology. Beginning in 1972, Yao worked as a medical technician and later as a supervisor in the department of hematology at Bayonne Hospital. In 1995, she left Bayonne Hospital to work for Brookdale Clinical Laboratory ("Brookdale"), a small medical lab in Hackensack, as a general supervisor of medical technicians and support staff. According to Yao, the owner of Brookdale encouraged her to open a "bleeding station," that is an office to which doctors refer patients to have blood or other bodily fluids drawn for analysis at a laboratory.
In 1996, Yao and Susan Reyes, Yao's sister and a registered nurse, formed plaintiff, a New Jersey corporation, with an office in Bayonne, which initially operated under the name RSB Services, Inc., as a bleeding station. Yao worked part-time at Brookdale and part-time at plaintiff, while Reyes, who was an equal partner in the business, contributed only financial resources. Brookdale referred its Bayonne patients to plaintiff for blood and fluid draws. Plaintiff would then send the specimens to Brookdale for analysis. Plaintiff received a commission from Brookdale for all laboratory work referred.
In 1997, Yao, who continued to operate plaintiff as a bleeding station, left Brookdale to work part-time as a sales person for Alex Laboratory ("Alex"), another small medical laboratory. Plaintiff sent specimens to Alex for analysis. Yao testified that in her estimation, ninety percent of Alex's business resulted from her referrals. *602 Plaintiff received a commission for all work referred.
In June 1998, Yao terminated her association with Alex and began sending blood samples for analysis to Clinical Diagnostics Services ("CDS"), a reference medical laboratory. At the same time, according to Yao, she also had a good working relationship with twelve area physicians who referred patients to plaintiff for blood extraction.
In late 1998, Yao began to implement a plan to transform plaintiff's business operations from a bleeding station to a full service laboratory. As a result, plaintiff changed its corporate name to "RSB Laboratory Services." According to Yao, the State required a medical laboratory facility to include the term "laboratory" in its name. Yao believed she could successfully operate the laboratory because of her experiences as a technician and a supervisor. She was also qualified by the State to operate this type of facility. She admitted, however, that in her capacity as a supervisor she did not have any actual experience operating the laboratory equipment.
In October 1998, Yao contacted defendant, a company engaged in the business of refurbishing, selling and servicing used laboratory equipment. Yao spoke to Peter Will, a salesman for defendant, and advised him that she had the facility and the client base to operate a lab, and now needed equipment in "excellent working condition" to conduct hematology, chemistry, and coagulation of blood testing. In this initial encounter with defendant, Yao addressed two issues she considered "very important," namely, service and training. According to Yao, Will assured her that they would provide service and maintenance of the equipment, provide her with training and training for all of plaintiff's technicians, and provide equipment that would be in "excellent working condition."
Will recommended that plaintiff purchase a refurbished Abbott Cell Dyn 1600 ("Cell Dyn"), a machine used for hematology testing to calculate a complete blood count, and a Hitachi 704 ("Hitachi"), a machine used to detect chemical imbalances in the blood, including cholesterol, blood sugar, triglycerides, bilirubin, sodium, potassium and other chemical compounds. Yao had no prior experience with the Hitachi, although she had worked on similar machines that performed the same type of testing.
Will advised Yao that she would need to have a floor drain installed prior to delivery of the equipment. He also advised her that she would need a water filtration system providing deionized water to operate the Hitachi. Will represented that U.S. Filter could provide the necessary system, and according to Yao, indicated that defendant would pay for it. In his trial testimony, Will indicated that plaintiff was to pay U.S. Filter for the water and drain filtration system and that defendant had only agreed to supply free of charge the actual filter.
Will quoted Yao a price of $24,375 for the equipment ($5850 (Cell Dyn) + $18,525 (Hitachi)). After discussing the price and financing options, Yao decided to obtain the equipment from defendant. The transaction was structured through a third-party lease with Lease World Corporation ("Lease World"), a company defendant had prior dealings with. Lease World approved plaintiff's application and authorized a $25,000 credit limit. In light of this credit authorization, Yao decided to also obtain a $500 BBL fibrometer ("fibrometer"), a machine used to perform coagulation testing. This item increased the total contract price to $24,875. Plaintiff declined to enter into a service contract, whereby defendant would have provided six months of unlimited service visits *603 and support, including preventive maintenance and repairs.
In January 1999, Reyes, on behalf of plaintiff, signed a lease contract under which plaintiff agreed to pay Lease World $1,523.80, representing the first and last months' rent, and upon receipt of the equipment from defendant, installments of $761.90 per month for forty-eight months. The lease provided that plaintiff had requested that Lease World purchase the equipment from defendant and that Lease World had no responsibility for the failure of defendant to deliver the equipment specified therein. Defendant was not a party to the lease. Yao indicated, however, that Lease World had agreed to pay defendant $25,000 upon plaintiff's receipt and acceptance of the equipment and upon plaintiff's execution of an "Equipment Condition Report." It is undisputed that Lease World, not defendant, drafted the equipment condition report, which required, inter alia, that plaintiff describe the overall condition of the equipment.

A

Equipment Problems
In late January 1999, defendant forwarded to plaintiff a copy of a partially completed equipment condition report, reflecting that plaintiff had received the equipment, that a complete quality control test had been performed, and that the equipment was in "excellent working condition." Yao refused to sign the report because she had not received the equipment. Thereafter, Yao testified that she received a telephone call from Will "insisting" that she sign the report. She again refused to do so. At trial, Will admitted that he spoke to Yao twice about signing the forms, but said it was "understandable" that she would not do so until she received the equipment.
On March 22, 1999, Brian Griffin, an employee of defendant, delivered to plaintiff the Cell Dyn and the Hitachi, but not the fibrometer. Griffin was unable to install the Cell Dyn and the Hitachi because an electrical outlet needed to be changed. Despite this problem, Griffin asked Yao to sign the equipment condition report, which again indicated that the equipment was operational and in excellent working order. Yao signed the report, but included the notation, "[r]eceived the instrument but not set-up yet."
Thereafter, Manny Licker, president of Lease World, made repeated telephone calls to both Yao and Reyes demanding that they unconditionally sign the report. Jeremy Linder, defendant's president, also called threatening to take the equipment back if they did not sign. On March 26, 1999, defendant sent plaintiff a fax containing the following message: "[A]s discussed with Manny [Licker], please have the enclosed [equipment condition report] form signed.... We will schedule to finish the installation next week."
Defendant followed this fax transmission with a letter signed by Will dated April 16, 1999, reading in part, that,
[a]s verbally agreed, [defendant] would refurbish the equipment to factory specifications. In addition, we would transport the equipment to your laboratory, install the equipment, and train the lab personnel on basic operation of the systems for the total cost of $25,000. As of today, we have refurbished the equipment and delivered it to the lab. We would like to fulfill our obligation of installing and providing training on the systems. In order to do so, we must first receive payment for the equipment.
As part of the leasing procedure, once the equipment is delivered, the "Equipment Condition Report" must be completed by both the Vendor and Lessee.

*604 [Defendant] ... has completed the report however the Lessee, ... [plaintiff] has not completed or signed the report. This report is just to acknowledge that the equipment has been received by the Lessee. Until this report is signed by both parties, [defendant] can not be paid and is unable to fulfill their obligation of installing and training.
According to Yao, Will called her again representing that the report was simply a "formality" and that she "must" sign it.
Shortly thereafter, plaintiff retained an attorney to represent its interests in this matter. As a result, plaintiff, defendant, and Lease World, entered into an agreement on May 18, 1999, which required, in part, that defendant: (1) install the Hitachi and the Cell Dyn at plaintiff's Bayonne offices in accordance with all manufacturers' specifications; (2) supply plaintiff with a fibrometer; (3) supply plaintiff with a water filter at no charge; (4) train four members of plaintiff's staff in the use of the Cell Dyn and Hitachi at either plaintiff's or defendant's office over three consecutive days; (5) supply plaintiff with sufficient chemical substances to conduct the training sessions; (6) provide written proof that the equipment conforms with all manufacturer's specifications; (7) provide equipment that functions in a manner that enables plaintiff to operate its business in accordance with any laws or regulations governing the operation of a medical laboratory; (8) perform twenty-six specific tests on the equipment; (9) provide plaintiff with the written results of these tests demonstrating that the equipment met or exceeded all applicable quality control standards; and (10) provide a ninety-day parts warranty commencing upon defendant's successful completion of the requirements in the above set-forth sections (6) and (8).
Under the agreement, plaintiff did not have to sign the equipment condition report until after defendant had installed the equipment and furnished written proof that the machines met or exceeded all applicable quality control standards. At that point plaintiff was to begin making the lease payments to Lease World.
What happened next is disputed by the parties. According to Griffin, on May 22, 1999, he delivered to plaintiff the fibrometer, installed the Cell Dyn and the fibrometer, but not the Hitachi, and performed a series of tests on the Cell Dyn and the fibrometer. Yao, on the other hand, testified that Griffin delivered only part of the fibrometer, namely the timer, and did not deliver the thermal prep block precision heating unit, which is the part of the fibrometer that incubated the plasma in the reagent in order to perform the coagulation test. In response, Linder testified that "the timer is the fibrometer" and that if plaintiff had wanted any additional accessories, such as a thermal prep block, she would have had to pay extra for it. Linder admitted, however, that he did not know if the fibrometer, as delivered, had sufficient parts to actually perform the required tests.
Sometime shortly thereafter, Griffin installed the Hitachi. Griffin explained that he hooked the Hitachi up to the deionization water system, attached an in-line five micron canister water filter, and ran calibration and control tests. He admitted, however, that he had not seen the May 1999 agreement prior to installing the equipment, and, therefore, did not perform all of the tests indicated therein. Notwithstanding these problems, on June 30, 1999, Reyes, on behalf of plaintiff, signed separate equipment condition reports for the Hitachi and the Cell Dyn, indicating that the condition of the machines was "excellent" *605 and that defendant had performed "complete quality controls."
On July 7, 1999, Yao and two other employees attended a five-day training session at defendant's facilities. Yao testified that because of the excessive heat in the warehouse, they could not operate the equipment and received no hands-on training. Instead they watched videos about the operation of the equipment and examined the machines. Yao admitted, however, that she did not complain about the adequacy of the training. Griffin testified that the equipment had been functioning, that he had provided hands-on training, and that he had used reagents to run samples on the machines. Yao subsequently obtained training from Sigma, a supplier of reagent for the machine. Sigma is a company with no connection to defendant.
From July 14 to July 16, 1999, Yao ran a series of tests or proficiencies on the Hitachi and the Cell Dyn, and as a result, on August 24, 1999, received a New Jersey laboratory license. However, during the performance of the tests on the Hitachi, Yao observed that the machine was not functioning properly because the water bath was not filling up. She called defendant's representative on July 14, 1999, to report the problem. Griffin responded that same date and repaired the problem.
Griffin cleaned the main filter and the main pump and performed several bath exchanges. He testified that during these tests the water filled to the correct level. He also cleaned the filter. He did not notice any cracks or cuts in the tubing that ran to the water bath while performing these operations. Griffin indicated that he spent an hour to an hour-and-a-half repairing the equipment. The statement of services submitted by defendant billed plaintiff for six hours of labor.
Yao continued to experience problems with the machines after these repairs were completed. She continually called defendant during the months of August and September to report these problems and request that repairs be made. Telephone records admitted at trial show that Yao called defendant's office on September 3, 7, 8, and 9, 1999. Yao also documented the errors in test results in the State-mandated preventive maintenance "action log."
In July 1999, Yao spoke to Will regarding defendant's promise to pay for the water filter. She also faxed defendant the $1,111.41 invoice from U.S. Filter, requesting that defendant assume responsibility for this charge. By letter dated August 3, 1999, defendant replied that it would only supply an external micron filter at no additional cost. Griffin admitted at trial, however, that the external micron filter was "irrelevant" because the deionizing system, which included the U.S. Filter, should filter the water sufficiently without it. It is undisputed that defendant did not pay for the U.S. Filter ordered by plaintiff, nor did it deliver the external micron filter.
In light of these difficulties, Yao sent notice to defendant declaring the contract breached. Thereafter, she contacted several other companies in an effort to repair or replace the Hitachi, but for various reasons they were all unable to service the equipment. She eventually reached an agreement with a California company called Act Diagnostic whose engineer replaced a leaking water hose, but could not correct the problem with the water bath, nor could he repair the motor, which made a "horrible" noise when turned on. Act Diagnostic represented the cost to replace the motor at approximately $2,500, but noted that it could not guarantee that that replacement would "make the machine work." Yao paid Act Diagnostic $400 for the service call.

*606 B

Measure of Damages
Yao testified that laboratory tests conducted with the Hitachi would have accounted for 95% of plaintiff's expected revenue. Thus, despite having a laboratory license and one of the three necessary pieces of equipment, she decided not to start operating the business. Notwithstanding its inability to generate income, plaintiff made seventeen lease payments amounting to $12,952.30. At the time of trial plaintiff owed Lease World thirty-one additional payments, or $23,618.90. Plaintiff also paid Sigma $2,339.83 for reagents it was unable to use.

Projected Lost Profits
With regard to lost profits, plaintiff called certified public accountant Bruce Jonas as an expert witness. In preparation to offer an opinion on the subject, Jonas: (1) reviewed documents listing revenues collected by laboratories from referrals made by plaintiff; (2) interviewed the Vice President of Client Services, a billing company performing work for laboratories and other medical facilities; (3) ascertained the quantities of reagent necessary for operation of a laboratory; and (4) reviewed profiles of large publicly-traded medical laboratories to determine whether revenue in the industry was rising.
Jonas admitted, however, that he had not reviewed plaintiff's business records or tax returns, although he had lengthy discussions with Yao. He explained that those documents were not relevant to plaintiff's potential success as a laboratory because they had been prepared when plaintiff was operating as a "bleeding station." Nonetheless, Jonas opined that, rather than being an entirely new business, a laboratory was a "natural follow up" to a bleeding station.
In determining lost profits, Jonas chose to use the revenue reports. He selected the reports generated by Alex, a lab used by plaintiff, as the "best available data to simulate what [plaintiff] would look like as... an operating laboratory." He reviewed seven months of Alex's revenue reports, from August 1997 to February 1998, listing revenues totaling $113,320 for work submitted to Alex by plaintiff. He did not, however, simply utilize Alex's entire revenue stream as a measure of plaintiff's potential profits. He limited his inquiry to the forty-two physicians who had referred patients to plaintiff as a bleeding station. He then chose only nine of those physicians as a prospective referring base. These nine physicians were considered because they (a) had placed an order in at least three of the seven months; (b) their referrals had averaged more than $100; and (c) had generated a payment in either of the last two months. He thus concluded that these nine physicians would continue to refer business to plaintiff when it became an operational laboratory.
Jonas next added the average of the monthly collections reported by Alex from the nine chosen physicians ($14,238) and deducted 5% from that amount, to account for any tests or procedures that plaintiff would not have been able to perform, and derived a projected gross monthly revenue of $13,526. Jonas cross-checked that amount by using a collection rate of 40% to 45%, thereby calculating that plaintiff's yearly gross billings would total $382,000.
Jonas then reduced the gross revenues of the nine physicians by plaintiff's projected monthly expenses, or $8,004.75, which included salaries, the cost of chemicals, and waste removal, and which resulted in a net monthly projected revenue of $5,521.25. Jonas ultimately calculated projected lost profits for plaintiff operating as a laboratory of $77,000 (one year), *607 $140,000 (two years), $194,000 (three years), $242,000 (four years), and $284,000 (five years). The four-year period selected corresponded to the length of the lease. Jonas admitted, however, that he did not know what the failure rate was for new laboratories.
According to Jonas, this methodology conformed to standard accounting practices. The information he relied upon was of the type generally relied upon by accountants in performing this type of revenue projection. His opinion as to lost profits was within a reasonable degree of accounting certainty, conservative and "probably the bottom end of the range."
Defendant presented no expert testimony regarding lost profits.

II
Defendant argues that the Law Division erred in denying its motions for summary judgment, R. 4:46-2(c), and for judgment, R. 4:40-1, because plaintiff's lost profits claim was barred by the new business rule. Although believed bound by the new business rule, both judges who heard defendant's motions expressed doubt that plaintiff was in fact a new business. The judge who heard the summary judgment motion stated:
I don't know that what plaintiff is projecting here is totally innovative. I think that there is a distinction. They have a business, or [sic] rather routine, straightforward kind of business. There are other businesses that one can look to. One might be able to provide a reasonable basis for jurors to make a determination. Which isn't to say, that we at the trial level, are not bound by the existence of a new business rule.
In denying defendant's R. 4:40-1 motion the trial judge specifically found that plaintiff was not a new business, explaining that,
[plaintiff] was an extension of an existing business ... albeit [a] bleeding business. It was an ongoing operation, although different in kind. The future business, or the new business, rationale... had appeal, because the success of that enterprise is ordinarily uncertain. In this case we had a certain business that was making money in this context. It was an expansion. This enterprise was not a new business starting as much [sic][.]
The court also found credible Jonas's testimony that plaintiff had a base of referring physicians who "had confidence" in Yao and would continue to refer business to plaintiff once it expanded into providing laboratory work. Thus, the judge found that Yao on behalf of plaintiff
had the goods, she had the machine, [and] she was licensed. By August of 1999 she was set up to go at that point. But ... for the ... water bath not filling we may have had a viable concern at that point and ... this would have been 95% of her business. She had the name, she had people that worked with her, and they were referring [business to plaintiff] ... as she had a track record that I think was amply demonstrated either in Brookdale ... or Alex ... or CDS, where she was a conduit. She had been in the community and has been represented for a while at this point[.]
Rule 4:46-2(c) provides that summary judgment shall be entered if
the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law. An issue of fact is genuine only if, considering the *608 burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact[.]
See Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 538, 666 A.2d 146, 155 (1995); Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 73-75, 110 A.2d 24, 26-27 (1954).
In determining whether a genuine issue of material fact exists, a trial judge should engage in a weighing process, one that is essentially the same as that used in motions for judgment under R. 4:37-2(b) (involuntary dismissal at trial), R. 4:40-1 (motion for judgment), and R. 4:40-2 (motion for judgment notwithstanding the verdict). Shelcusky v. Garjulio, 172 N.J. 185, 200, 797 A.2d 138, 148 (2002). The standard is "whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill, supra, 142 N.J. at 540, 666 A.2d at 156.
A party may defeat a motion for summary judgment by demonstrating that the evidence relied upon by the moving party, considered in light of the applicable burden of proof, raises sufficient credibility issues "to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Id. at 523, 666 A.2d at 147. "[W]hen the evidence `is so one-sided that one party must prevail as a matter of law,' ... the trial court should not hesitate to grant summary judgment." Id. at 540, 666 A.2d at 156 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202, 214 (1986)). The appellate court applies the same standards as the trial court. Alloway v. Bradlees, Inc., 157 N.J. 221, 231, 723 A.2d 960, 965 (1999).
Similarly, in deciding a R. 4:40-1 motion for judgment the court must accept as true all the evidence which supports the position of the non-moving party, according him or her the benefit of all legitimate inferences, and if reasonable minds could differ, the motion must be denied. Pressler, Current N.J. Court Rules, comment on R. 4:40 (2004); Lewis v. Am. Cyanamid Co., 155 N.J. 544, 567, 715 A.2d 967, 978 (1998). "The purpose of this test is to ensure that the jury resolves disputed factual matters." Lewis, supra, 155 N.J. at 567, 715 A.2d at 978. On appeal the court applies the same standard. Estate of Roach v. TRW, Inc., 164 N.J. 598, 612, 754 A.2d 544, 551-52 (2000); Estate of Chin by Chin v. St. Barnabas Med. Ctr., 160 N.J. 454, 469, 734 A.2d 778, 785 (1999); Baliko v. Int'l Union of Operating Eng'rs, 322 N.J.Super. 261, 273, 730 A.2d 895, 902 (App.Div.), certif. denied, 162 N.J. 199, 743 A.2d 851 (1999).
Here, defendant argues that the court erred in denying its motions because plaintiff's claim for lost profits was barred by the new business rule. "Under contract law, a party who breaches a contract is liable for all of the natural and probable consequences of the breach of that contract." Pickett v. Lloyd's, 131 N.J. 457, 474, 621 A.2d 445, 454 (1993). Lost profits are one measure of compensatory damages that may be recoverable in a breach of contract action, if they can be established with a "reasonable degree of certainty." Stanley Co. of Am. v. Hercules Powder Co., 16 N.J. 295, 314, 108 A.2d 616, 626 (1954); Desai v. Bd. of Adjust. of Town of Phillipsburg, 360 N.J.Super. 586, 595, 824 A.2d 166, 172 (App.Div.), certif. denied, 177 N.J. 492, 828 A.2d 920 (2003); V.A.L. Floors, Inc. v. Westminster Communities, Inc., 355 N.J.Super. 416, 425, *609 810 A.2d 625, 630-31 (App.Div.2002); Perth Amboy Iron Works, Inc. v. Am. Home Assur. Co., 226 N.J.Super. 200, 224, 543 A.2d 1020, 1033 (App.Div.1988), aff'd, 118 N.J. 249, 571 A.2d 294 (1990).
Moreover, the "fact that a plaintiff may not be able to fix its [lost profits] damages with precision will not preclude recovery of damages." V.A.L. Floors, supra, 355 N.J.Super. at 424-25, 810 A.2d at 630 (quoting Inter Med. Supplies v. EBI Med. Sys., 181 F.3d 446, 463 (3d Cir.1999), cert. denied, 528 U.S. 1076, 120 S.Ct. 791, 145 L.Ed.2d 667 (2000) (citing Am. Sanitary Sales Co. v. State, Dep't of Treasury, 178 N.J.Super. 429, 435, 429 A.2d 403, 406 (App.Div.), certif. denied, 87 N.J. 420, 434 A.2d 1094 (1981))). In that regard, "[p]ast experience of an ongoing, successful business provides a reasonable basis for the computation of lost profits `with a satisfactory degree of definiteness.'" V.A.L. Floors, supra, 355 N.J.Super. at 425, 810 A.2d at 631 (quoting Weiss v. Revenue Bldg. & Loan Ass'n, 116 N.J.L. 208, 212, 182 A. 891, 893 (E & A 1936)).
However, under the new business rule prospective profits of a new business are considered too remote and speculative to meet the legal standard of reasonable certainty. In re Merritt Logan, Inc., 901 F.2d 349, 356 (3d Cir.1990); Weiss, supra, 116 N.J.L. at 212, 182 A. at 893. In Weiss, the Court described the new business rule as follows:
There is a well-established distinction, in respect of the ascertainment of future probable profits, between a new business or venture and one in actual operation. In the first, the prospective profits are too remote, contingent, and speculative to meet the legal standard of reasonable certainty; while in the second, the provable data furnished by actual experience provides the basis for an estimation of the quantum of such profits with a satisfactory degree of definiteness.
[116 N.J.L. at 212, 182 A. at 893.]
In 1990, the Third Circuit in In re Merritt Logan, supra, rejected the new business rule as a statement of the law in New Jersey. 901 F.2d at 356. The court noted that the new business rule was then over fifty years old and that the New Jersey Supreme Court had not had a recent opportunity to reconsider the rule in light of the modern trend allowing new businesses to recover lost profits when those losses could be proved with reasonable certainty. Id. at 357. The court predicted that under the right circumstances the New Jersey Supreme Court would "no longer follow a per se rule precluding all new businesses from recovering any damages for lost profits." Ibid.
In 1992, the New Jersey Supreme Court decided Perini Corp. v. Greate Bay Hotel & Casino, Inc., 129 N.J. 479, 484-89, 610 A.2d 364, 366-69 (1992), overruled on other grounds, Tretina Printing, Inc. v. Fitzpatrick & Assocs., Inc., 135 N.J. 349, 358-59, 640 A.2d 788, 792-93 (1994), in which a casino obtained an arbitration award from a general contractor for lost profits incurred as a result of a construction delay in a renovation project. The three-Justice plurality addressed the issue of lost profits as follows:
[The general contractor] argues that the renovation project amounted to a new business. In Weiss ... the Court stated that lost profits for a new business are "too remote, contingent and speculative to meet the legal standard of reasonable certainty." ... [The casino] questions that argument. It points out that the casino had a proven track record; the location and nature of the business never changed; and the management team never changed.

*610 However, even were we to consider profits from the 1984 season as those of a new business, the trend in recent cases has been to award lost profits for a new business when they can be proved with reasonable certainty.... In In re Merritt Logan, Inc. ... the court predicted that this Court would follow that trend and allow lost profits for a new business if damages were proved with reasonable certainty.... That court also relied on comment 2 to N.J.S.A. 12A:2-708(2) (UCC), which states that "[i]t is not necessary to a recovery of `profit' to show a history of earnings, especially if a new venture is involved." Ibid. Given that recent trend, the arbitrators cannot be said to have acted in manifest disregard of the law. Thus, because the arbitrators were presented with enough evidence to decide that Sands had proved its lost profit damages with reasonable certainty, the damage award does not fall.
[Id. at 509-10, 610 A.2d at 379 (some citations omitted).]
In Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1176 (3d Cir.1993), the court set forth that,
New Jersey no longer adheres to its "new business rule" which, as embodied in several older New Jersey cases, indicated that lost profits of a new business are too remote and speculative to permit an award of damages .... In In re Merritt Logan ... we predicted that the New Jersey Supreme Court would abandon the "new business rule" in favor of permitting the recovery of such damages if proven with reasonable certainty. Shortly thereafter, the New Jersey Supreme Court confirmed this prediction in Perini ... in which that [C]ourt, in permitting a renovated casino to recover lost future profits as a new business, cited In re Merritt Logan. While we recognize that Perini involved damages awarded in an arbitration, we believe that the Supreme Court of New Jersey would apply its holding to trials in court as well.
See also In re Auricchio, 196 B.R. 279, 291 (Bankr.D.N.J.1996) (New Jersey no longer adheres to the "new business rule.").
Thereafter, in Bell Atl. Network Serv., Inc. v. P.M. Video Corp., 322 N.J.Super. 74, 98-99, 730 A.2d 406, 419-20 (App.Div.), certif. denied, 162 N.J. 130, 741 A.2d 98 (1999), Judge Coburn, writing for the court, declared that New Jersey still followed the "new business rule" as set forth in Weiss, explaining that,
[t]he only exception to the rule that we are bound by decisions of the Supreme Court and the Court of Errors and Appeals is where "more recent decisions of the Supreme Court clearly undermine the authority of a prior decision, although not expressly overruling it." Burrell v. Quaranta, 259 N.J.Super. 243, 252, 612 A.2d 379[, 383-84] (App. Div.1992) (emphasis added). While the arguments for abandonment of the "new business rule" appear to be persuasive, those arguments are not supported by a majority opinion of the Supreme Court; rather, they appear only in the plurality opinion in Perini. That is not a sufficient basis for us to say that Perini, which only involved arbitration and was itself overruled on other grounds in Tretina Printing, ... clearly undermined the authority of Weiss.

See also V.A.L. Floors, supra, 355 N.J.Super. at 425, n. 8, 810 A.2d at 631, n. 8 ("In Bell Atlantic ... we adhered to the `new business rule' of Weiss, despite the three judge plurality opinion in Perini ... which noted the recent trend to allow an award for lost profits even in the case of a new business `when they can be proved with reasonable certainty.'").
*611 In this light, we are constrained to conclude that New Jersey continues to follow a minority of states that adhere to the new business rule. Stuart Park Assocs. Ltd. P'ship v. Ameritech Pension Trust, 51 F.3d 1319, 1328 (7th Cir.1995); Interstate Dev. Servs. of Lake Park, Georgia, Inc. v. Patel, 218 Ga.App. 898, 463 S.E.2d 516, 517 (1995); see e.g. Lockheed Info. Mgmt. Syst. Co. v. Maximus, Inc., 259 Va. 92, 524 S.E.2d 420, 429-30 (2000).
The vast majority of jurisdictions have rejected the new business rule, as a per se rule of exclusion, and instead allow lost profits when they can be proved with reasonable certainty. See e.g. Int'l Telepassport Corp. v. USFI, Inc., 89 F.3d 82, 86 (2d Cir.1996) (under New York law new business rule does not per se preclude lost profits); Advent Sys. Ltd. v. Unisys Corp., 925 F.2d 670, 681 (3d Cir.1991) (under Pennsylvania law new business can prove lost profits with reasonable certainty); Super Valu Stores, Inc. v. Peterson, 506 So.2d 317, 327 (Ala.1987) (anticipated profits of new business recoverable if proved with reasonable certainty); Cardinal Consulting Co. v. Circo Resorts, Inc., 297 N.W.2d 260, 267 (Minn.1980) (new business rule no longer law); McNamara v. Wilmington Mall Realty Corp, 121 N.C.App. 400, 466 S.E.2d 324, 330 (1996) (refused to adopt new business rule); Welch v. U.S. Bancorp Realty and Mortgage Trust, 286 Or. 673, 596 P.2d 947, 964 (1979) (reasonable certainty standard applies to new business lost profits); Smith Dev. Corp. v. Bilow Enters., Inc., 112 R.I. 203, 308 A.2d 477, 482-83 (1973) ("reasonable certainty" rule not per se new business rule applies); Drews Co., Inc. v. Ledwith-Wolfe Assocs., Inc., 296 S.C. 207, 371 S.E.2d 532, 534 (1988) (new business rule not automatic bar); Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Ins. Co. of N. Am., 955 S.W.2d 120, 132 (Tex.App.1997) (Texas case law in line with vast majority of jurisdictions in rejecting "new business rule" as per se exclusion), aff'd sub nom. Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. 20 S.W.3d 692 (Tex. 2000).
The majority approach conforms to Restatement (Second) of Contracts § 352 comment b (1981), which provides in part that
[i]f the breach prevents the injured party from carrying on a well-established business, the resulting loss of profits can often be proved with sufficient certainty. Evidence of past performance will form the basis for a reasonable prediction as to the future.... However, if the business is a new one or if it is a speculative one that is subject to great fluctuations in volume, costs or prices, proof will be more difficult. Nevertheless, damages may be established with reasonable certainty with the aid of expert testimony, economic and financial data, market surveys and analyses, business records of similar enterprises, and the like.
We recognize that the Restatement leaves open an avenue for a new business to utilize modern accounting practices and other forms of financial forecasting principles to establish a loss of potential profits with reasonable certainty. These modern accounting tools were not available to the Court when it decided Weiss in 1936. The inflexible "bright line" approach of the new business rule thus runs directly counter to both the national trend and to modern accounting practices.
Perhaps the time has come for our State to join the majority of jurisdictions that have abandoned this anachronistic rule for the more flexible approach of the Restatement. However, our role as an intermediate appellate court is to follow the dictates of the Supreme Court or, as in this case, its predecessor, the Court of *612 Errors and Appeals. Nixon v. Lawhon, 32 N.J.Super. 351, 355, 108 A.2d 480, 481-82 (App.Div.1954). We are thus constrained to agree with our colleagues in Bell and V.A.L., that, until the Supreme Court says otherwise, the new business rule remains the law in this State. Weiss, supra, 116 N.J.L. at 212, 182 A. at 893; Bell Atl., supra, 322 N.J.Super. at 98-99, 730 A.2d at 419-20. Therefore, the question remains whether plaintiff is a new business subject to the rule.
Here plaintiff had been operating as a bleeding station since 1996, drawing blood and other bodily fluids and sending those fluids to other laboratories for analysis and testing.[1] The laboratories paid plaintiff a commission on those referrals and sent plaintiff written records verifying those amounts. In late 1998, plaintiff sought to expand its business to include the laboratory work, using its same employees, facilities, and customer base. It needed only new equipment and a license to accomplish the expansion.
This record stands in sharp contrast with the facts in Weiss. In Weiss the plaintiff leased from the defendant a fifty-six-room building in Newark, which he operated as a "rooming house." Weiss, supra, 116 N.J.L. at 209, 182 A. at 891. The plaintiff then sought to exercise an option for the lease of the adjoining fifty-six-room building. Ibid. The defendant breached the agreement to lease the second rooming house, and the plaintiff sued for, among other relief, lost profits. Ibid.
The Weiss Court held that the prospective profits of the new lease arrangement were too speculative to provide a tangible basis for computation. Id. at 212, 182 A. at 893. The testimony dealing with lost profits was based entirely on plaintiff's experience in operating the first rooming house. Id. at 212-13, 182 A. at 893. No evidence was presented, however, of a need for additional housing facilities in the vicinity. The first rooming house was also not operated to full capacity. Id. at 213, 182 A. at 893. In this context the Court found that the "business was essentially transient in character, and fluctuated in volume." Ibid. On that basis the Court held that "the anticipated profits were so remote, speculative, and problematical as to preclude their consideration in the appraisement of the loss .... [and] obviously did not satisfy the legal standard." Ibid.
Similarly in Seaman v. U.S. Steel Corp., 166 N.J.Super. 467, 469, 400 A.2d 90, 91-92 (App.Div.), certif. denied, 81 N.J. 282, 405 A.2d 826 (1979), the plaintiffs operated a marine business, specializing in marine salvage. The plaintiff sought to construct a 100-ton-capacity-floating crane. Ibid. The plaintiff purchased steel plates from the defendant to affix the crane to the boom, but the steel did not have the properties as certified, rendering the crane unusable. Id. at 469-70, 400 A.2d at 91-92. The plaintiff sued, for among other relief, lost profits. Id. at 470, 400 A.2d at 92. At trial the plaintiffs "introduced testimony of loss of profits allegedly resulting from their inability to bid on an Army contract which required the use of the crane and, alternatively, loss of rental value of the floating crane at $25,000 a month." Id. at 472, 400 A.2d at 93. The jury found for plaintiffs. Id. at 468, 400 A.2d at 91.
On appeal, we held that the evidence failed to support the jury's award. Id. at *613 475, 400 A.2d at 94-95. In so doing, we explained that the plaintiffs had
never operated a crane of this size in their business, nor had they ever rented such a crane to others. It was to be a new operation in their business, without prior experience as to the floating crane's potential as profit-producing equipment. Cf. Weiss, [supra].... In Apex Metal Stamping Co. v. Alexander & Sawyer, Inc., 48 N.J.Super. 476, 481, 138 A.2d 568[, 571] (App.Div.1958), the court restated the necessity to distinguish between uncertainty as to the fact of damage and uncertainty as to its amount. It is where it is certain that damages have resulted and the evidence affords a basis for estimating the damages with some degree of certainty that recovery is allowed.... We conclude that here ... the alleged loss of rental value was incorrectly admitted and incorrectly considered by the jury under the quoted section of the Restatement, because it was not shown that plaintiffs suffered any loss of profits or that they had previously engaged in the floating-crane rental business and, finally, it was not shown that they had lost any opportunity to rent the floating crane.
[Ibid.]
In contrast here plaintiff had operated a bleeding station and sought to expand that business using existing clients and referring physicians, thereby resulting in readily ascertainable profits. Plaintiff did not need to find new business as in Weiss, or new customers as in Seaman. In that regard, Weiss and Seaman are distinguishable. We thus agree with the trial court. The new business rule is inapplicable in this case. The record here provides a rational basis in which to calculate profits with a reasonable degree of certainty.
[At the direction of the court, the discussion of the other issues in the appeal has been omitted from the published version of the opinion.]
The judgment based on the jury award with respect to plaintiff's breach of contract claim is affirmed. The part of the judgment based on the Consumer Fraud Act is vacated and reversed.
WEFING, J.A.D., concurring.
In the posture in which this case has been presented to us, in which both parties contend that the issue whether operation of RSB Laboratory Services, Inc. was a new business or an extension of an existing business is a matter of law, not a question of fact, I concur in the comprehensive opinion of Judge Fuentes.
My colleagues conclude that the requisition and commission reports to which plaintiff pointed to support its claim of lost profits are not hearsay within N.J.R.E. 803(c)(6) because they were relied upon by Yao in the regular course of her business. While I disagree with this conclusion, it does not provide a sufficient basis to dissent. N.J.R.E. 803(c)(6) incorporates the business record exception to the hearsay rule. It requires that the writing or other record be "made in the regular course of business" and that it be the "regular practice of that business to make" such writing. The records in question do not come within N.J.R.E. 803(c)(6) by virtue of Yao's reliance upon them.
Certain of the records, however, such as requisition forms to Brookdale, do fit within N.J.R.E. 803(c)(6). Yao testified that she would prepare such forms from the doctor's prescription and forward them to the lab.
The purpose of N.J.R.E. 803(c)(6) is to provide a "sufficient guarantee of trustworthiness." Liptak v. Rite Aid, Inc., 289 *614 N.J.Super. 199, 219, 673 A.2d 309, 319 (App.Div.1996). A careful review of the records presented by plaintiff in evidence, although not prepared by plaintiff, indicates that a very large portion of them contain facial indications of trustworthiness. The payment reports from Brookdale, for example, indicate both the date and time they were printed, in each case immediately following the close of the monthly reporting period. Each also specifically indicates that it relates to Yao.
Admittedly the records from Alex are not so detailed. But the inclusion of those records does not, in my view, so taint the result that a reversal would be required.
Finally, these records were used by plaintiff's expert in the course of formulating his opinions in this case. Under N.J.R.E. 703, the data relied upon by an expert in formulating an opinion need not be admissible in evidence.
NOTES
[1] Defendant argues that plaintiff only offered hearsay evidence, in the form of requisition and commission reports from Alex, Brookdale and CDS, in support of its argument that it operated a bleeding station beginning in 1996. We disagree. Yao testified that she received the reports from the respective laboratories in the regular course of business. N.J.R.E. 803(c)(6).