**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0109-17T4

MICHAEL L. MCDONALD
and POINT BREAK GROUP
MANAGEMENT, LLC,

     Plaintiffs-Appellants,

v.

CITY OF WILDWOOD,

     Defendant-Respondent.

_____

Submitted September 21, 2018 – Decided November 26, 2018

Before Judges O'Connor and DeAlmeida.

On appeal from Superior Court of New Jersey, Law Division, Cape May County, Docket No. L-0545-12.

Messa & Associates, PC, attorneys for appellants (Joseph L. Messa, Jr., Thomas N. Sweeney and Megan M. Kwak, on the briefs).

Mary D'Arcy Bittner, City Solicitor, attorney for respondent.

PER CURIAM

Plaintiffs, Michael L. McDonald and Point Break Group Management, LLC (Point Break), appeal from an August 24, 2017 Law Division order granting defendant the City of Wildwood summary judgment dismissal. McDonald is the majority member of Point Break.[1] After reviewing the record and applicable legal principles, we affirm.

I

On June 22, 2012, plaintiff and defendant entered into a concessionaire agreement, which gave plaintiff the right to hold certain events and to provide for various activities to take place in Wildwood from 2012 to 2016. In return, plaintiff was obligated to compensate defendant under the terms of the agreement. Plaintiff was formed for the purpose of entering into the agreement with defendant.

During the summer of 2012, the sole activity plaintiff operated in Wildwood was a surfing school, which generated less than $5,000 in revenue. In September 2012, defendant sought to void the agreement on the ground plaintiff failed to operate other events and, thus, violated its obligations under the agreement. In response, plaintiff filed a complaint in lieu of prerogative

---

[1] For simplicity, unless stated otherwise, for the balance of the opinion the term "plaintiff" shall refer only to Point Break.

writs seeking to enforce the agreement, contending defendant interfered with plaintiff's ability to abide by it.

In May 2012, the parties entered into a consent order, which dismissed the litigation and amended certain terms of the concessionaire agreement,[2] including extending the duration of the agreement to 2017. In 2014, plaintiff filed an amended complaint in lieu of prerogative writs, alleging defendant breached the agreement and that such breach interfered with plaintiff's ability to bring to or operate events and activities in Wildwood, thwarting plaintiff's ability to earn income.

During his deposition, McDonald testified that, before plaintiff filed the amended complaint, he had engaged in negotiations with various venders on behalf of plaintiff, but conceded he was not successful in entering into any contract with any vendor who would have provided any event or activity to take place in Wildwood. McDonald also testified plaintiff was relying upon its two expert witnesses to establish the damages plaintiff sustained as a result of defendant's alleged breach of the agreement.

In one of his two expert's reports, Stephen Scherf, plaintiff's expert accountant, opined plaintiff would have earned a total of $27,667,000 in gross

---

[2] For the balance of the opinion, we refer to the consent order as the "agreement."

3

profits from 2013 to 2017 if defendant had not breached the agreement. Specifically, plaintiff would have earned $12,250,000 in gross profits for providing facilities for surfing and stand-up paddling, $11,510,000 for producing concerts, and $3,907,000 for producing other events and activities. After subtracting costs, the net income to plaintiff would have been $6,791,866.

Scherf's report assumes plaintiff would have provided the events and activities itself, rather than a third-party vendor. However, during his deposition, Scherf characterized plaintiff's "business model" as, for the most part, a "licensing model." According to Scherf, that meant plaintiff would have earned income by charging licensing fees to third-party vendors, who in turn would have provided the events and activities defendant wanted. Scherf explained that a license fee can be

> view[ed] . . . as rent for the specific area. So it's a fee. So . . . when someone signs up for the license fee[,] they pay that to Point Break Management for the license or the ability to operate in that specific area. And so that's the business model. . . . [T]hat fee would be similar to rent I guess is the easiest way to explain it from a financial standpoint.

Although plaintiff's income was going to be derived, for the most part, from licensing fees it received from vendors, there was one exception. One of

4

plaintiff's minority members, Ian Cairns, was going to set up and run a surfing school, and oversee providing other water activities and beach amenities.

During his deposition testimony, Scherf referenced an attachment to his report in which he listed a projection of the licensing fees vendors would have paid plaintiff from 2013 to 2017, but for defendant's breach of the agreement. The licensing fees plaintiff would have earned net of costs would have been $1,172,100. Scherf testified he obtained his estimate of licensing fees from his review of "industry information," and from McDonald, Cairns, and Denny Somach, plaintiff's other expert witness. However, Scherf subsequently conceded industry information about licensing fees is not available, so he decided to rely upon Somach to provide an opinion about the licensing fees plaintiff could have earned and, to some extent, upon McDonald's and Cairns' opinion.

During his deposition, Somach testified his expertise is limited to promoting and marketing concerts. Second, and more significantly, Somach stated he did not know how much a promoter would pay in licensing fees.

As for Scherf's reliance upon information McDonald provided, during his deposition McDonald was asked whether he had any financial projections for the amount plaintiff would have earned but for defendant's breach of the

5

agreement. McDonald indicated plaintiff retained experts to provide such information and that it would be provided. Those experts were Scherf and Somach, neither of whom had knowledge of the licensing fees plaintiff might have earned.

As for Cairns, his expertise was limited to producing surfing, stand-up paddle board, and similar sporting events and activities. As stated, Cairns planned to operate a surfing school, and oversee providing other water activities and certain beach amenities. For these efforts, plaintiff would not have earned licensing fees but income.

As for evidence of what plaintiff could have earned from Cairns' contributions, when negotiating the subject agreement with defendant, plaintiff provided to defendant financial projections of what it anticipated earning in profits. During his deposition, Scherf stated he relied on such projections to form his opinion about the profits plaintiff would have earned had it provided the activities, events, and amenities plaintiff sought to bring to and establish in Wildwood. As previously noted, one of those projections was plaintiff would have earned a total of $12,250,000 from 2013 to 2017 for providing surfing and stand-up paddling events and activities.

6

However, significantly, during his deposition, Cairns admitted the origin of such projections were the result of a meeting in which the principals gathered to "think about those [matters] deeply." He conceded such projections were only estimates and, once plaintiff implemented what it intended to provide under the agreement, he would have "accurate numbers [of what plaintiff's profits actually were] based on what we had actually done."

At the conclusion of discovery, defendant filed a motion for summary judgment, in which it argued the agreement was void because defendant had failed to comply with the New Jersey Local Public Contracts Law (LPCL), N.J.S.A. 40A:11-1 to 40A:11-52. Approximately one month later, defendant filed a second motion for summary judgment, in which it claimed that, even if it had breached the agreement, plaintiff could not prove damages and, thus, defendant was entitled to summary judgment dismissal. Specifically, defendant contended the facts upon which plaintiff and its experts relied in support of its claim for damages were unreliable or unfounded, making plaintiff's purported damages entirely speculative.

In its written opinion, the trial court found the agreement unenforceable because of defendant's failure to comply with the LPCL, but found there were genuine issues of material fact concerning plaintiff's equitable claims, which

7

precluded the court from granting defendant's initial motion for summary judgment. However, the court granted defendant's second motion for summary judgment dismissal because of "the speculative nature of the damages and the lack of concrete data to support the claimed damages." The court noted plaintiff could not sustain a cause of action for breach of contract if it could not prove damages, see Globe Motor Co. v. Igdalev, 225 N.J. 469, 482 (2016) (noting that "a loss to the plaintiff[s]" is one element of a breach of contract claim); see also Coyle v. Englander's, 199 N.J. Super. 212, 223 (App. Div. 1985).

## II

On appeal, plaintiff asserts the following points for our consideration:

> POINT A: THE TRIAL COURT ERRED IN GRANTING WILDWOOD'S MOTION FOR SUMMARY JUDGMENT BECAUSE IT USURPED THE ROLE OF THE JURY IN FINDING PLAINTIFF'S PROPOSED EXPERT OPINIONS WERE INADEQUATE.
>
> POINT B: THE TRIAL COURT ERRED IN FINDING PLAINTIFF FAILED TO SET FORTH SUFFICIENT EVIDENCE OF LOST PROFITS.
>
> POINT C: THE TRIAL COURT IMPROPERLY APPLIED THE "NEW BUSINESS RULE" BECAUSE POINT BREAK, LLC WAS NOT A NEW BUSINESS.

8

POINT D: THE TRIAL COURT INCORRECTLY REVIVES THE LONG-REJECTED "NEW BUSINESS RULE" TO FIND PLAINTIFF'S EXPERTS ARE BARRED AS NET OPINION.

POINT E: THE TRIAL COURT ERRED IN FINDING THAT THE CONSENT DECREE IS NOT ENFORCEABLE.

We "review[] an order granting summary judgment in accordance with the same standard as the motion judge." Bhagat v. Bhagat, 217 N.J. 22, 38 (2014). We "must review the competent evidential materials submitted by the parties to identify whether there are genuine issues of material fact and, if not, whether the moving party is entitled to summary judgment as a matter of law." Ibid.; see also Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995); R. 4:46-2(c). However, a trial court's determination that a party is entitled to summary judgment as a matter of law is "not entitled to any special deference," and is subject to de novo review. Manalapan Realty, L.P. v. Twp. Comm., 140 N.J. 366, 378 (1995).

When evaluating the motion record, we view the facts in a light most favorable to the non-moving party, "keeping in mind '[a]n issue of fact is genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion . . . would require submission of the issue to the trier of fact.'" Schiavo v. Marina Dist. Dev. Co., LLC, 442 N.J.

9

Super. 346, 366 (App. Div. 2015).  Bare conclusions lacking factual support or disputed facts "of an insubstantial nature should not preclude grant of [a summary judgment] motion."  Pressler & Verniero, Current N.J. Court Rules, cmt. 2.1 on R. 4:46-2 (2018).  "Competent opposition requires 'competent evidential material' beyond mere 'speculation' and 'fanciful arguments.'" Hoffman v. Asseenontv.Com, Inc., 404 N.J. Super. 415, 426 (App. Div. 2009) (quoting Merchs. Express Money Order Co. v. Sun Nat'l Bank, 374 N.J. Super. 556, 563 (App. Div. 2005)).

Here, plaintiff claims damages in the form of lost profits.  Lost profits are a measure of compensatory damages that may be recoverable if capable of being established to a "reasonable degree of certainty."  Desai v. Bd. of Adjustment, 360 N.J. Super. 586, 595 (App. Div. 2003) (citing Stanley Co. of Am. v. Hercules Powder Co., 16 N.J. 295, 314 (1954)).  Anticipated profits that are too remote, uncertain, or speculative are not recoverable.  Ibid.  That a plaintiff may not be able to fix its lost profits with precision will not preclude recovery of damages, but courts require a "reasonably accurate and fair basis for the computation of alleged lost profits."  V.A.L. Floors, Inc. v. Westminister Cmtys., Inc., 355 N.J. Super. 416, 424 (App. Div. 2002).

10

One of the issues raised before the trial court was the applicability of the New Business Rule. According to this Rule, a new business may not use prospective profits to show damages because such profits are too speculative to meet the legal standard of reasonable certainty. See Bell Atlantic Network Servs., Inc. v. P.M. Video Corp., 322 N.J. Super. 74, 101 (App. Div. 1999) (quoting Texas Instruments, Inc. v. Teletron Energy Mgmt., Inc., 877 S.W.2d 276, 279-80 (Tex. 1994)) (holding alleged lost profits that are dependent on entry into unknown markets, or the success of a new and unproved enterprise, cannot be recovered because the business venture is so risky as to preclude recovery of lost profits in retrospect). Rather, the "provable data furnished by actual experience provides the basis for an estimation of the quantum of such profits with a satisfactory degree of definiteness." Weiss v. Revenue Bldg. & Loan Ass'n, 116 N.J.L. 208, 212 (E&A 1936).

The Rule, however, does not impede a new business from recovering lost profit damages if such business can show with reasonable certainty proof of lost profits. For example, in RSB Lab. Servs., Inc. v. BSI, Corp., 368 N.J. Super. 540 (App. Div. 2004), the plaintiff, a facility that drew and forwarded blood samples to a laboratory for testing, expanded its operations to provide a full service laboratory. Id. at 544. When the plaintiff subsequently sued the

11

defendant, which was a supplier of equipment for the plaintiff's laboratory, defendant argued the plaintiff was barred from recovering lost profits under the New Business Rule. Id. at 555. We held the Rule inapplicable under those circumstances because, although the plaintiff expanded its business and was, therefore, arguably a new business, the plaintiff relied upon existing clients and referring physicians to maintain and earn income from its new enterprise. Thus, despite being a new business, the plaintiff's lost profits could be calculated with a reasonable degree of certainty. Id. at 562.

Here, plaintiff cannot show lost profits with reasonable certainty. Plaintiff was not an established business or an extension of a previous one. Plaintiff was formed to engage in a new venture in Wildwood. Although plaintiff's members may have had some experience in providing the events and activities plaintiff hoped to bring to Wildwood, they had not done so before in this location – a new market. Plaintiff had no longstanding customers or promoters to whom it could turn to guarantee business. Plaintiff was "a new and unproved enterprise." Bell Atlantic, 322 N.J. Super. at 101.

Further, the opinions of the experts plaintiff retained to show it sustained lost profits are unavailing. Scherf testified he obtained his estimate of licensing fees plaintiff lost as a result of defendant's alleged breach of the

12

agreement from his review of "industry information," and from McDonald, Cairns, and Denny Somach. However, Scherf conceded industry information about licensing fees is not available; Somach could not offer any evidence about the licensing fees plaintiff could have earned; and McDonald relied on Scherf to provide the evidence of plaintiff's alleged lost profits.

Cairns' expertise is limited to surfing, stand-up paddling and similar sporting events. Plaintiff was not going to use a vendor to provide these events. Even if Cairns offered an opinion of the licensing fees plaintiff might earn, such fees would vary depending upon, among other things, the vendor and the terms of the contract between a vendor and plaintiff.

Further, there is no competent proof of the profits that would have been generated by Cairns' contributions to plaintiff's venture. At his deposition, Cairns was asked about the source of the financial projections plaintiff provided to defendant, which included plaintiff's opinion of the profits it anticipated earning from implementing the agreement. Cairns admitted the projections came from plaintiff's members thinking "deeply." Scherf relied on those projections to estimate the profits plaintiff lost as a result of defendant's breach of the agreement. In short, there is no competent evidence of what a

13

prospective vendor might pay in licensing fees or the profits that would have been generated by Cairns' contributions to plaintiff's venture.

Because plaintiff's alleged lost profits are too speculative to satisfy the legal standard of "reasonable certainty," we affirm the grant of summary judgment dismissal. We have considered plaintiff's remaining arguments and conclude they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). In light of our disposition, we need not address whether the trial court erred when it found the agreement unenforceable because defendant failed to comply with the LPCL.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION